Case number 25-3555, the Scotts Company LLC v. I'm sorry, the Scotts Company LLC et al. v. Procter & Gamble. Argument is not to exceed 15 minutes per side. Mr. Gabrielides for the appellants. Good morning, your honors. John Gabrielides on behalf of the appellants, which I'll refer to as Scotts. I'd like to reserve five minutes for rebuttal. When Congress passed the Lanham Act, it directed that courts are to consider the likelihood of confusion and dilution from the standpoint of the ordinary consumer. If we apply that overarching principle, which will permeate my comments here today, that it is the ordinary consumer whose interests we are interested in. If we apply that to the facts of this case, they roughly come out as follows. Would an ordinary consumer who walks into a store like Home Depot looking for a lawn and garden product on which they would spend $10 to $20 and see the spruce package singly, not side-by-side because this is how the products are offered, and separately from Scotts Miracle-Go-Traderess, who would have only, in the words of the court in other cases, a general vague or hazy recollection or impression of the Miracle-Go-Traderess, would they believe that there is an association, connection, or sponsorship between the manufacturers of the two products? They are sold in the same store, and Scotts has sold its Miracle-Go-Traderess in the retail marketplace for over 50 years. The question is not whether we, as lawyers or judges, can parse out minute differences between the appearance of the products. We certainly can. The question is, would the ordinary consumer do so? That's the problem with the district court decision below. What the court failed to do is look at it from the perspective of the consumer. So, for instance, we have language in the opinion where the judge says, if we look closely, we can see a thin gold line in the Miracle-Go-Traderess, but it's absent from the spruce Traderess. That may be true. The question is, is there any evidence in the record, or is there any reason to believe that we, as ordinary consumers, we're not dealing about a niche product or a specialized product, or this is a consumer retail product? But you can see a difference in the spruce, that it has the clear at the bottom where you can see the liquid inside, and then you look at the Miracle-Gro, and Miracle-Gro has the black circle with the white letters on it. So an ordinary consumer who buys lawn products might see that these are different products. They might, but the real question here is, is there any evidence to believe that that difference, for example, is something that consumers pick up on, or do they just look at the overall package? Isn't your own description of your Traderess has all of the elements about where's the green, where's the yellow, where's twice, where's the? I mean, I guess if you go to that level, garden and lawn products, what do garden and lawns have? Green stuff and yellow stuff. And a lot of other companies, apparently, as in the record, not your side, not the other side, have things that are green and yellow. So isn't it your side that's specifying this clarity of Traderess? So in effect, does Scott's own green and yellow? As you probably know, I was involved in Abercrombie and Fitch versus American Eagle, where they were trying to have trade dress in earth tones, which we did not grant. Now here, of course, you have to have enough likelihood of success to get a preliminary injunction, because even if we affirm right, you can go back to try to get to trial, defeat summary judgment, and maybe convince a finder of fact that there's confusion. But at this stage, to say you have a likelihood of success, how do you get around the fact that not just your adversary, but others go into green and yellow for these kind of products? Okay. I think I hear three separate issues there. I'll try to tackle them one at a time. No? On the other products in the marketplace, two relevant facts there. One is there's no evidence in the record about the degree to which those products have captured the consumer mind. In other words, just because they're in the marketplace does not mean that they detract from the strength of the Miracle-Gro Traderess. Let me take it. I'll stretch the point to prove the point. Let's pretend for a moment that, and this actually was, I believe, the product was Sunday. One of the products that the Proctor & Gambler-Latin was called Sunday. It had just entered the marketplace. There was no evidence about the degree of market penetration, how long consumers had seen the product, the level of sales. So the fact that it merely exists does not detract from the consumer's impression of the market, which could, Your Honor, and I think that is a fair point, it could reduce the commercial strength of the market. But there's no evidence of any of this in the record. They simply put third-party products before the district judge and said, look at all this green and yellow. Second point, a minor one, but I think it's worth pointing out. Green and yellow, as you say, grass and sun. Keep in mind, spruce is a weed killer. It doesn't grow things. It kills things, okay? The next point, you've hit on a pet peeve, which I would love to discuss at length of mine. We are legally required, Your Honor, to list the elements that make up the trade dress. There's plenty of case law from all different circuits on this point. Because what the courts don't want is the defendant shooting in the dark, okay? That legal requirement does not displace the fact that trade dress, as the Supreme Court has told us over and over again, is the overall impression of the product. So for instance, where we list the trade dress, we do not list shape of the container. That's important so that the defendant knows that it doesn't have to rebut that aspect of the package. Ironically, the district court judge here relied on the difference in the shape of the containers. But we never claimed it. So to be very specific, Judge Boggs, we have to list the elements because the case law requires us to. But the trade dress consistently in all circuits, including the Supreme Court, is the overall impression, period. Okay, so you listed five elements, correct? Correct. And the district court opinion lists them on page four of its opinion. So green and yellow color combination. Am I reading the right one? With each color presented as a separate horizontal band. Correct. And the top color taking a smaller ratio than the bottom. Two bands sharing a common border. Straight line dividing the two colored bands. And a circular horizontally centered graphic element. So is that the only thing that we should be looking at to decide what the overall impression is? Well, in my view, you follow the reverse approach. You look at the overall impression that consists of those images. And you can use those images as a guide, we don't contend otherwise, to see if there's similarities. But always the analysis of the individual elements is in service of whether a consumer walking down an aisle in a commercial retail establishment, seeing these products singly, not together, is likely to pick out those individual differences. This is not a case of a counterfeit case where the defendant has slavishly copied every element. In fact, there are very few of those cases. So you necessarily have to look at individual components. Always, though, always, in service of whether the consumers care about that individual component and whether it somehow dominates over the overall impression of the trade justice. That's where I think the judgment went awry. So what is your best evidence from this two-day hearing to show that the average consumer would have this confusion? Well, two things, I think, are obvious things. One is there's testimony by Mr. Sass that consumers walk into Home Depot, let's say, and they see Miracle-Gro at various places in the store, outside, in certain aisles, on displays, and so on. And then they go to the aisle that has the spruce weed killer, where the product is not sold side by side. Keep in mind now there's history involved. Scotts has been selling Miracle-Gro in this trade justice for nearly 70 years. The number of commercial impressions that it has generated, I rarely have a case where I have the luxury of these kinds of facts. It is exceedingly strong. It is present in their minds. If they see a new product on the market, and this is a new product, this is Brockham Gamble's entry into the lawn and garden, Brock, is it reasonable to assume that the existing commercial impression that they have of the overall Scotts trade justice is triggered by seeing a similar trade justice? And that reminds me, I need to go back to something I forgot to mention to Judge Boggs. Scotts does not claim monopoly power in yellow and green. That's not this case. If it were just yellow and green and plenty of other differences, we wouldn't be here. So I don't think that's the issue. Your red light is on, so you have saved five minutes for rebuttal. You can use it now if you wish, or you can use it in rebuttal. I think I'd like to save it for rebuttal. I do have a question, which is taking my time, not yours. You say in your brief that you have this line, whether or not the district court's bottom line conclusion is correct, a question not presented in this appeal. The method the district court used was flawed. So the question that I have is, do we have jurisdiction over the appeal? Because you say you're not presenting the question whether the district court's bottom line conclusion is correct. I understand your question. I think perhaps that was not clearly stated. What we're saying is that whether the district court's conclusion was correct on the analysis it applied, we're not debating that. What we're saying is they applied the wrong analysis, so it has to be brought back down to the district court to apply the correct analysis. Maybe the court ends up at the same place, but maybe it doesn't, and that's what we're talking about here. So I do believe if this court remains back down to the district court for an application of the correct legal principles, then we could have a different result, and that gives this court jurisdiction over the end decision. Thank you. Thank you. May it please the court. My name is Lauren Cooley. I represent Procter & Gamble. I'd like to begin with a legal point and a record point to respond to the discussion that we just had about similarity. The first is the district court did everything it was supposed to do under this court's precedent and ultimately compared the overall visual impression of the products. And then the record point is the district court did everything Scott asked it to do and more. And I'll come back and explain how we know the court applied the appropriate legal standard here, but first, just to begin with the record, Scott's actually invited an element-by-element, side-by-side comparison before the district court. At the preliminary injunction hearing, the district court invited counsel for the parties to explain to the court how to synthesize this court's precedent and how to assess similarity. And in the closing arguments, he asked counsel for Scott's, when the products were out in their physical form before the court, is it my holistic assessment as I gaze over there and look at these products, do they strike the court as similar, or how do you suggest the court go about assessing the similarity factor? Scott's counsel responded, in all candor, that is the beginning of how you have to do that. You have to look over there and make your own judgment. And that is record 69, page ID 5970 to 5971. And then again, in their post-hearing brief, their argument on similarity amounts to an element-by-element comparison of the products, and that is it. It's the district court, despite this invitation to rely solely on a side-by-side comparison, that zooms out and undertakes what it describes as a more holistic comparison than what Scott's invited. So it's extraordinarily unfair to now fault the district court for doing even more than what Scott's actually asked it to do below. The ultimate task here, as the court acknowledges repeatedly, is overall visual comparison. We know that because it says so six times in the similarity section of the opinion. So looking at the district court opinion, on the first page, at least of the printout that I have of the district court, they have Miracle-Gro products, and on the second page, the second layer is a bunch of the Spruce products. So the holistic approach, where the district judge is supposed to be trying to figure out what the ordinary consumer would think, the ordinary consumer would probably visually look at the Miracle-Gro products and then look at the Spruce product and say, are these similar? Are they different? Is that the basic holistic thing that you can do, too? That's right. If you're gazing at the product and you look away and you gaze at the other product, what's your overall impression? Are you confused by who is making these products? And the court observes differences do matter in this analysis. As this court's precedent instructs, Bliss says side-by-side comparison isn't the ultimate conclusion, but it's a reference tool. The court's cases repeatedly compare differences, including Abercrombie, including AutoZone, and determine what those differences add up to and what the similarities in individual features add up to. And here, it's important the court was viewing these products in person and photographs of these products on shelves. And it said, in person, what really strikes you is this unique, transparent panel on the Spruce product. What really strikes you about Miracle-Gro is this black and white circular logo that you're going to look for when you're looking for a Miracle-Gro product and you're not going to see on Spruce. It points out, in person, the shades of yellow and green are distinctly different. Judge Box observed that there are greens and yellows all over the place in this space. And the district court says, in fact, Miracle-Gro uses these brighter shades of yellow and green, similar to what a lot of the other third-party products use. But Spruce is distinct in that it has a darker spruce, almost kind of a bluish undertone type of a green. And that is like a spruce tree. Precisely, Your Honor. And that's the color that predominates in your overall impression of the product. And Scott's own witness, it's interesting because Scott's own witness distinguishes competitor products on these same grounds. At the preliminary injunction hearing, Scott's witness, Mr. Sass, talked about how Preen, which is a directly competitive weed preventer product, looks different, is distinct enough from Miracle-Gro, because it uses different proportions of the colors. It distinguished Sunday, the witness distinguished Sunday, another competitor product, on the basis that green comes first in the order of color bands. Yellow comes first instead of green, I believe it was. So these concessions about the significance of proportions of color, they come from Scott's own witness. And Scott argues it had to list the elements, but it was actually Scott that made a fairly myopic argument about how the elements come into play. The district court throughout its- Yes, Judge Moore. Would consumer surveys be the best evidence of what consumers think about similarities? The best evidence, and this court has observed this in cases like Daddy's Junkie Music, is evidence of actual confusion in the marketplace. So a consumer complaint or evidence of lost sales. Despite these products being sold by these very large companies in very large stores like Walmart, at this point for 18 months, it was six months at the time of the hearing, there is undisputedly no evidence of any lost sales, any report of an actual instance, despite these products being viewed by millions of consumers in the real world marketplace. So you're absolutely right. The evidence of actual confusion would be the best proxy, but we don't have that. Consumer survey evidence can be used as additional evidence of actual confusion, but the district court found their survey evidence on confusion to be not credible. They haven't appealed that. And Scott is really trying to turn this into a de novo legal dispute on similarity, but the district court followed this court's precedent to a T. And so what you're left with is a finding based on two days of testimony, including how consumers encounter these products in the market that is reviewed for clear error. That's a primarily factual finding that these products are dissimilar, and this court should defer to that. The question is not whether there are commonalities between the products. It's whether the overall visual impression given by the products would cause confusion among consumers. And the district court repeatedly came back to that question, which is would ordinary consumers be confused by these products. This court in Abercrombie teaches that where a defendant has made a strong showing of dissimilarity, that's effectively insurmountable for the plaintiff when you're dealing with the Frisch factors. That's even more so the case here, where, as Judge Boggs pointed out, we're here on a preliminary injunction. Abercrombie was further down the line. Here it's Scott's burden to establish, make a clear showing of likelihood of success. Where you have highly dissimilar products and that factual finding is entitled to deference, where you have no evidence of actual confusion, and where you have a fact-intensive determination that's best made by the district court, they simply haven't met their burden of showing the likelihood of success. If I could divert you for a moment to the dilution claim. My understanding is that there is this relatively newer statute that came after the AutoZone case. Does the new statute change the analysis from what the AutoZone factors were in a way that is important for our reviewing what the district judge did on dilution? The statute has changed, and so the standard that AutoZone applies has presumably changed as well. But, in fact, it doesn't matter here because what the new statute requires is similarity as a predicate to any kind of dilution claim, an association arising from similarity. The district court in this case relied on its conclusion that the products are highly dissimilar in concluding that Scott's had not met its burden of likelihood of success in dilution. The cases that Scott cites, they recognize that similarity is actually a necessary predicate to these dilution claims. The problem in those cases, which, by the way, were summary judgment and post-trial cases. They were the final judgment posture. The problem in those cases was that the district court actually applied, and it's intertwined throughout the analysis in those cases, a nearly identical standard or a substantially similar standard rather than just a similarity standard. Here, the court had already expressly found the products dissimilar, and so Scott's doesn't get through the door for greater analysis, particularly on a preliminary injunction where the question is, have you made a clear showing of likelihood of success? When you say the statute still requires similarity, is that a bright line rule, or is it some similarity? You could certainly say two things are somewhat similar, they're really similar, they're identical. The statute says association arising from similarity, and similarity actually wasn't in the prior statute. And to your question, Judge Boggs, what is the meaning of similarity? What does that mean? In this context, to be similar, we have two answers. It means the overall visual impression is confusing to consumers, and also under the Abercrombie case where it's so clear to all but the most obtuse consumer that the products are distinguishable, they're dissimilar. Would it be fair to put it that prior to the statute, there was a requirement of heightened degree of similarity, that after the statute, similarity is still a factor, that you need some similarity which would be weighed with other parts of the test. Is that fair or not? I think it's two things. I think that's once you have shown some threshold similarity, degree of similarity comes into play when the court's assessing whether there's likelihood of dilution. But the court doesn't even have to get to that level of detail here because Scotts didn't in the district court. Scotts quoted the factors, this is the blurring factors that Judge Boggs was referring to, but then it just says district court, you can rely on the infringement analysis. It doesn't make any separate argument, this was in its post-hearing brief, as to how those new factors would apply. It relies on the similarity analysis that had already been undertaken in the infringement section, the other claim in its brief. So again, the district court doesn't need to do more than Scotts asked it to do, and in any event, followed the law, including under the new statute. And again, here, it's Scotts' burden to make a clear showing that they've established likelihood of success. So there would be no need to remand. This isn't like the Starbucks or the Levi case, where the improper standard was woven into the district court's analysis, and we were at a different stage. I'd also like to point out that there's another way to resolve the dilution claim and the treacherous claim, and that's that we're here on a preliminary injunction, and it's striking that the word irreparable is nowhere in their opening brief. That is a prerequisite of the extraordinary relief that they've asked for in the district court, and Judge Moore, as you point out, they don't ask the court to reach the ultimate conclusion. They don't argue that the district court abused its discretion in denying a preliminary injunction, and that alone is a basis to affirm the district court here. Scotts bears the burden of showing likely, imminent, non-speculative, concrete harm. It actually made a finding at the last page of its decision that even if Scotts made a sufficient showing on likelihood of success to consider other factors, they don't weigh much, if at all, in Scotts' favor. And it made specific factual findings that there were no lost sales, no consumer complaints, that any harm to brand loyalty was too speculative at this stage, that there was no credible survey evidence. Scotts doesn't appeal any of that. And even in this appeal, Scotts has given no indication that emergency relief needs to be issued, as opposed to allowing the proceedings to play out as they continue to do now below, after full merits proceedings. They asked for a remand on a couple of factors and no more. They took full extensions in all of their briefs. And in the meantime, the likelihood of any consumer confusion dwindles. The party's packaging continues to change. And this is the subject of a new complaint Scotts filed a few weeks ago, and the counterclaims that P&G responds to. This is record 104 and 105. So even if a presumption of irreparable harm had arisen, it would be rebutted on these facts. The court can rely on that principle as well to decide the appeal. If there are no further questions, I'd ask the court to affirm. Let me start with dilution. The statute does not have a threshold requirement of some degree of similarity. It simply says similarity. And it is in service of the question, is there some association that either blurs or dilutes the mark? Similarity is one factor. It is not an on-off switch. It is a continuum. One thing we know for sure, based on the Trademark Dilution Revision Act of 2006, is that you cannot tie the degree of similarity for dilution to a degree of similarity for likelihood of confusion. These are two different things. So did you, at the district court level, present material on all of these factors that are listed in 1125 CTV? We did. We did, Your Honor. And let me go through them. The degree of acquired distinctiveness of the mark, that is, what have our sales been, what have the promotional and advertising expenses been, how many commercial impressions, that is in the record. Our substantially exclusive use of the mark, we've been using it for 50-plus years exclusively, of this trade dress. The degree of recognition of the mark, that is a derivative finding from the number of commercial impressions. We did introduce evidence of intent that we think is relevant. And there is a survey on actual association. The important point here is, Your Honor, is that the district court didn't look at any of that. Right, but the first factor, which you didn't list, is the degree of similarity between the mark or trade name and the famous mark. But the facts for those are the same as the facts for the likelihood of confusion. The standard, though, is different. That's the effect of the TDRA, and that's where we believe the district court went awry. I'll briefly talk about irreparable harm, Your Honor. If the district court had found that we had a likelihood of success on the merits, irreparable harm would have been presumed. Because we believe the district court erred on its conclusion of likelihood of merits, it necessarily didn't conduct the correct analysis under irreparable harm. It's derivative entirely, and trademark law is unique in this respect. So did you present any evidence on irreparable harm, or did you rely entirely on the first finding? No, we did both. Mr. Sass testified about the lack of control over the trade dress is what creates the irreparable harm to Scotts, just like any trademark owner. Once somebody else is out there using a mark that is confusingly similar, the trademark owner is at the mercy of that infringer, and you lose control over the carefully curated reputation and goodwill and feelings that people have about the mark. That is what irreparable harm is in the trademark context, and Mr. Sass testified about that. I'm asking a question out of the blue, I realize. If spruce were just the best product ever, you would still have irreparable harm? Right. I've seen this argument before. Yes, because it's a control issue. Because we don't know, we can't control what the defendant, the quality associated with the defendant's mark. Maybe in this case it's great, but maybe it's not. And the lack of control is what creates, and this was in case law for decades, and then Congress changed the irreparable harm requirement, and now you can show both, right? It used to be you just show likelihood of confusion, irreparable harm is presumed, end of story. But now we have to show more, and we did.  And that, I think, is why the dilution analysis, it was cut off prematurely, and we need to go back for more full explanation. I want to go back to one comment the counsel made. It does sound like something I would say in the district court where I told Judge Cole, yes, that's the beginning of an analysis. The beginning, you have to look at the elements. But that is not the end of the analysis. The question is, does the element by element comparison speak to the consumer experience in the marketplace? It is not my commercial impression or any particular person's. The beginning must include an evaluation. It is always in service, though, of whether consumers walking through these aisles, ready to spend $10 to $20 on a Laudan Garden product, do they recognize these differences? And remember, we're talking about shades of gray and a thin line. I'm sorry. Excuse me. Shades of green and a thin borderline. And, by the way, a ratio that the judge relied on that is simply factually incorrect. So I think I could see myself saying, yes, that is the beginning of an analysis, but it is not the end. I would like to mention the Abercrombie and Fitch case. Okay, they were trying to claim trade dress protection in a catalog. And if I remember this correctly, there were so many photos of erotic or homoerotic poses in one with college-age people, and all the clothes bore the plaintiff's housemark, which is different from a trademark. And then the defendants had like a family-oriented magazine, fewer photos, people of all ages. And, importantly, on every page, there was a ubiquitous name of the producer on every page of those catalogs. We're not talking about mail-order catalogs, which seems like an eternity ago. People get their mail-order catalogs at home. I see my time is up. May I continue? Okay, thanks very much. Well, thank you both for your argument. The case will be submitted.